Anderson, J.
On the 8th of May, 1862, the common council of the city of Lynchburg, by authority of the act of assembly of 29th of March, 1862, passed an ordinance “that notes under the denomination of one dollar, be issued as a currency.” They were to be is.sued only by the treasurer, and were not to exceed $120,000.
In 1867, the plaintiffs, who were bankers and brokers in the city of Lynchburg, were in possession of a large amount of these notes, at the time they were assessed with a license tax of $1,125 by the said city. They offered to pay the tax with these notes at the scaled value of Confederate treasury notes in relation to gold, as of their date, which they alledge is $1,687 50 of the face of the notes. They tendered that amount to the city collector, in payment of their said tax, which he refused to receive. And they being unwilling to pay in United States currency, he levied upon their properly, the sale of which was injoined by the Circuit court, upon the application of the plaintiffs by bill in chancery. The injunction was afterwards dissolved and the bill dismissed by the Circuit court, and an appeal taken by the plaintiffs to the District court, which affirmed the decree of the Circuit court. And from that decree of affirmance, the plaintiffs have appealed to this court.
The case is one of great importance, not so much for the amount involved in. this suit, though that is considerable, as for the principle to be decided, in which the cities, and many of the towns, of this Commonwealth, may be very largely interested. It demands, therefore, our most careful consideration.
The plaintiffs contend that they have a right to pay the tax with those notes, by virtue of the act of assembly authorizing the issue; by the ordinance under which they were issued, and by the face of the notes. The act of assembly of 29th March, 1862, authorizing *336 tlieir issue, expressly provides, “that the notes issued • as aforesaid shall he receivable in payment of all dues to the corporation issuing them.” And the city ordinance directs, that the notes issued shall be inscribed on their face, “received in payment of city taxes or all other city dues.” And it is presumed that all the notes were issued with that inscription on their face.
This language imports an obligation on the part of' the city to receive these notes in payment of “ city taxes and all other city dues.” But it imposes no higher obligation than is imposed by the 5th section of the ordinance, which is in these words: “All notes issued under this ordinance, the faith of the city of Lynchburg is hereby inviolably pledged to redeem, in current bankable funds, when presented in sums of one or more dollars.” I think it is clear, if the city was under an obligation to receive those notes in payment of taxes in 1867, when they were presented, it was bound to redeem them in funds which were then current and bankable. The question of obligation, in both cases, depends upon this, whether it was a promise to pay in such funds as were current and bankable at the time the notes were issued, or in such funds as were current and bankable after the war, when demand of payment was made.
The contract must be construed in reference to the provisions of the act of assembly, by'authority of which the notes were issued. It must be presumed that it was the intention of the city, in issuing those notes, to comply with the terms of the law; and of the other parties in receiving them, to have received them with the understanding that they had been issued and would be redeemed in accordance with its manifest intention and object. Accordingly the plaintiffs, in their bill, very properly, do not rest their claim entirely upon the face of the notes and the ordinances of the city council, but also upon the act of assembly, *337 without the authority of which they could have had no validity.
If then, when the city council ordered those notes to he issued, it was understood that they were to be issued only for a temporary purpose; that they were not to constitute a permanent currency of the country, hut were intended merely to supplement the Confederate currency, and were • to he redeemed and withdrawn from circulation at an early day; if this was understood to he the policy and purpose of the act of assembly, and that those issues were to constitute a small note currency merely to meet an exigency occasioned hy the war, which had withdrawn specie from circulation, until some other remedy could he devised; and that in furtherance of said policy, the Legislature had required that provision should be made annually for the redemption of 33£ per cent, of the issue, so that the whole might be redeemed in the course of three years, then the pledge given hy the city council must he understood to have been given with a reference to that implied understanding, that the notes were to he presented for payment in accordance with the policy and requirement of the law. Suppose that the act of assembly, having provided that the city should provide for the redemption of those issues in one, two and three years, had expressly required that the holders should present them for redemption in that period (the language, though more explicit, would not more certainly disclose the purpose and policy of the Legislature), would not the pledge to receive them in payment of city taxes, or to redeem them when presented &c., in current bankable funds, be construed to have been given with the understanding that they would he presented within the time limited, and would he redeemed with such funds as were then current and bankable ?
But the case is stronger, in view of what was in fact *338 the action of the city under this act of assembly. The city did not avail itself of all the time allowed by the act for the redemption of those issues. The act does n°t inhibit the city from making provision for an ear-Her redemption than the time specified. The intention of the Legislature evidently was, that the issues authorized should be redeemed at an early day, and the utmost time allowed to make provision for their redemption, was the period specified. But the city council, as we think they had a right to do, determined to do more, and made provision for their redemption pari passu with their issue, by requiring that the very funds received for them should be specially set apart, held and invested for their redemption. And this was done in strict conformity to the requirement of the ordinance.
It is true that a subsequent act was passed on the 15th of May, extending the time for the redemption of those notes to four, five and six years. Upon a fair construction, I think that provision is applicable to issues made under the 3d section. But it only extends the privilege of the cities, towns and counties, which .they might avail themselves of or not as they chose. The city of Lynchburg did not avail herself of that privilege. She had not, as we have seen, availed herself of the full time allowed by the first act. Her ordinance had been passed and notes issued under it, and direction given for the provision which should be made for their redemption,.before the amendatory act was passed. And she made no change in her action thereafter. So that it is manifest the city of Lynch-burg did not avail herself of any privilege proffered by the act of assembly of 15th of May. And her ordinance having been passed, and her whole scheme for issuing and redeeming the notes in question having been adopted prior to that act, and not afterwards *339 changed, cannot be regarded as having been adopted with reference to it, nor can her undertaking be construed by its provisions.
How, was it the intention of the Legislature, by the act of March 29th, 1862, or indeed by the subsequent acts amendatory thereof, that the issues authorized to be made should be redeemed in funds which were current and bankable at the time of their issue, or in any other than Confederate currency? A provision that they were to be received in payment of city taxes after the war, and redeemable in such currency as was then current and bankable, it is perfectly manifest, would have defeated the very object of the law; which was to provide a currency. "With such a provision, they would have been immediately withdrawn from the channels of circulation, and held as an investment, and not circulated as currency.
It was not the design of the Legislature to provide a better currency than the Confederate. It was to supplement it with a fractional currency for the accommodation of the public, as a substitute for Confederate currency, the government of the Confederacy not having authorized the issue of notes under the denomination of one dollar. These notes were undoubtedly expected to be exchanged for Confederate notes of a larger denomination than one dollar; and being no better than Confederate notes, were expected to be redeemed with them—the small notes for the large ones. When exchanged, the note-holder would have the small notes, and the city the large ones. If the Confederacy was overthrown, the large notes would go down with it, and the small notes must incur the same fate. So that It was not a matter of much importance, whether the small notes were returned to the city, and the large notes to the note-holder, before the fall or not; the consequence to both would be the same. The act of the Legislature was evidently designed for the accommo *340 dafion of the people. If, in carrying it out, the city invested the notes in Confederate bonds, it was because those bonds were readily convertible into Confederate 110'fces > 80 that she might he ever ready to redeem her notes when presented for payment. And if by such an investment she made a profit, it was perfectly legitimate, and merely incidental, and not at all in conflict with the design and policy of the law to accommodate the public. Upon the whole, therefore, I think it was not contemplated by the Legislature, in the acts authorizing these issues, that they should be redeemed in any other than Confederate currency. Certainly there is nothing in the acts to inhibit the cities from providing.that they should be redeemed in such currency.
And the city of Lynchburg virtually did so provide. This is shown by the 4th section of the-ordinance; and by the acts of the proper city authority, in its execution. By this section the council provided that the whole fund received in exchange for these notes should be entered on the treasurer’s books, to the credit of “small note account,” “as a fund appropriated, and to be so held or invested, and held exclusively for the redemption of the notes so issued.” The treasurer was authorized to receive, in exchange for them, “bankable funds; ” and he tells us that he received entirely Confederate money for them (which was bankable, and the ■currency of that date), which was daily deposited in •bank to the credit of “small note account,” to the full amount of $72,418 60 (the whole amount of issues under the ordinance); that $67,000 of the amount were invested, between the 6th of May, 1862, and the 8th of October following, in Confederate States bonds, for the redemption of those notes, and the balance remained in bank until it was deposited in the Citizens’ Savings Bank of Lynchburg, in ■ 1864, where it still remains. The invested fund was increased to $68,100, by changing some of the convertible bonds into others of ano *341 tiier class. But that fund in Confederate States bonds is now in the hands of the treasurer, for the redempti on of the small notes.” That these bonds were readily convertible into Confederate treasury notes is a fact of history. From the foregoing, I think the ordinance of the council, and the acts of the city authonties, do most conclusively show that the city did intend, when issuing these notes, that they were to he redeemed in Confederate currency. And this intention not being in conflict, hut in accord, with the language and spirit •of the act of Assembly under authority of which they were issued, I think it is a fair presumption that they were received by the parties to whom they were issued •with the understanding that they would he redeemed in that currency; or would he received in payment of •city taxes, which were recoverable in the same currency.
Upon the whole, I conclude that, according to the true understanding and agreement of the parties, this •contract was to he fulfilled, on the part of the city of Lynchburg, in Confederate States treasury notes, and was made with a reference to such notes as a standard of value.
This was what the city undertook, and the parties to whom the notes were issued must he presumed to have accepted them with that understanding. And we have seen that the city made ample provision to redeem the notes in Confederate currency. It cannot he doubted that if the holders had presented these notes, in accordance with the obvious purpose of the act of Assembly, they would have been promptly redeemed. Before the notes on deposit in hank were exhausted, they could, and doubtless would, have been replenished as fast as they were needed, by converting the bonds, which were readily convertible, into currency. It seems to me that the city, when she had made provision for the redemption of these notes whenever presented, had *342 complied with the contract on her part. "What more could she have done?- It was no part of her contract to look up those notes to redeem them. She was only bound to redeem them when presented and demanded. And the holder could not maintain an action on them mitil demand made and refusal, unless he could show that the city had closed doors and refused to redeem. Her contract being to redeem in Confederate currency when presented and demanded, the holder having failed to demand payment until the currency which the city had provided for their redemption, without fault on her part, had become worthless, cannot now demand payment in United States currency. ISTor can he take-advantage of his own laches in not demanding payment before Confederate currency became worthless, now to demand what was the value of the notes in that currency, at a time when it had any value.
An attempt was made in argument to liken this case to that of Boulware v. Newton, 18 Gratt. 708. I do not perceive the analogy. The peculiar feature of that ease is, that the obligee expressly reserved the right to designate the time when payment should be made, and negatived the right of the obligor to pay at any other-time; and by the terms of the' contract, payment was to be made in such funds as were current at the time of payment The court held that it was a contract of hazard, and that one of the hazards was the contingency as to the result of the war, whether it would be adverse or favorable. It is difficult to perceive how a contract could be framed which more effectually secured to the obligee the right to postpone payment until after the termination of the war, and then to receive it in such funds as were then current, whether Confederate or United States, according to the result of the war. And if was because the evidence that such was the intention of the parties to the contract, was so clear and conclusive dhat the court felt impelled-, in that case, *343 to a conclusion which bore so heavily and harshly upon the obligor. I should be indisposed to extend the principle of Boulware v. Newton in its application to other cases, and would not apply it unless required so to do by clear and conclusive evidence, in order to give effect to the intention of the contracting parties. In this case there is no such evidence of intention, but much to show the contrary.
Upon the whole, I am of opinion that the decree of the District court should be affirmed.
The other judges, concurred in the opinion of Anderson, J.
Decree affirmed.